**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:13-cv-506-FDW**

|                          |   |              |
|--------------------------|---|--------------|
| GARY L. DANIELS,         | ) |              |
|                          | ) |              |
|     Petitioner, | ) |              |
|                          | ) |              |
| vs.                      | ) |              |
|                          | ) | **ORDER**    |
| FRANK L. PERRY,          | ) |              |
| LAWRENCE PARSONS,        | ) |              |
|                          | ) |              |
|     Respondents. | ) |              |
| _____ | ) |              |

**THIS MATTER** comes before the Court on Respondent's Motion for Summary

Judgment, (Doc. No. 7), Respondent's Motion for Leave to File Excess Pages, (Doc. No. 8), and

Petitioner's Motion for Summary Judgment, (Doc. No. 13). Petitioner is represented by Lauren

E. Miller of North Carolina Prisoner Legal Services.

## I.  BACKGROUND

### A.  Procedural Background

Petitioner is a prisoner of the State of North Carolina, who, on April 6, 2011, in

Mecklenburg County Superior Court, was convicted after trial by jury of first-degree murder and

sentenced to life imprisonment without parole, in case 09 CRS 210578. On March 6, 2012, the

North Carolina Court of Appeals filed an unpublished opinion finding no error, and on June 13,

2012, the Supreme Court of North Carolina denied petition for discretionary review. State v.

Daniels, 722 S.E.2d 212 (N.C. App.) (unpublished), review denied, 366 N.C. 221, 726 S.E.2d

182 (2012). Petitioner was represented at trial by Grady Jessup and North Carolina Prisoner

Legal Services, Inc., and on appeal by Appellate Defender Staples Hughes and Assistant

Appellate Defender Barbara Blackman.

Petitioner brings the following grounds for relief in the petition: (1) his right of due process was violated by the trial court's failure to suppress his statements that were made in custody and the police failed to advise him of his rights at the outset of interrogation; (2) Miranda warnings delivered in the midst of a continuing interrogation were ineffective to the point that a person in Petitioner's position would not have understood them to mean that he had a choice about continuing to talk; and (3) he clearly and unequivocally asserted his right to counsel, which was patently ignored by the interrogating officer in violation of his right to counsel during custodial interrogation. On January 3, 2014, Respondent filed the pending motion for summary judgment. On January 31, 2014, Petitioner filed his own summary judgment motion, and a response to Respondent's summary judgment motion. On February 18, 2014, Respondent filed a reply to Petitioner's response.

B. Underlying Facts

1. Charney Watt is Killed

On March 1, 2009, Charney Watt ("Charney") was an eighteen-year-old senior at Olympic High School in Charlotte, North Carolina, when Petitioner shot her in the forehead with a shotgun in an upstairs bedroom of his mother's house, ending her life. (Trial Tr. at 1376-79, 1665-66; 1692-93; 1778; Trial Tr., Doc. Nos. 1-11 to 1-20).[1] Petitioner and Charney had been dating since August 2008, the beginning of Charney's senior year. (Id. at 1379-82; 1389). Testimony at trial indicated that Petitioner and Charney had a volatile relationship, characterized by break-ups, reconciliations, and acts of violence by Petitioner. (Id. at 1406-08).

---

[1] Record citations to the trial transcript are to the actual trial transcript pages rather than as shown on the Court's docket entries.

On March 1, 2009, the day of Charney's death at approximately 11:35 AM, Officer Harold Norman ("Officer Norman") of the Charlotte-Mecklenburg Police Department responded to a vehicle accident located about one mile from the street where Petitioner's mother lived. (Id. at 1484-85). Upon arrival, Officer Norman noted that a black BMW had run off the road, slid about 75 feet through muddy weeds, and come to rest against a tree. (Id. at 1485). Officer Norman also saw a black male, later identified as Petitioner, and a black female, later identified as Charney, standing in the street about seven to ten feet apart from each other. (Id. at 1485-86). No injuries were reported, and neither Petitioner nor Charney requested medical attention. (Id. at 1484; 1488).

When Officer Norman asked about the accident, Petitioner told Officer Norman that he was driving the speed limit when the black BMW hydroplaned and ran off the road. (Id. at 1487). Officer Norman told Petitioner that there was no way the black BMW could have slid such a distance and sustained such damage if Petitioner had been driving at the posted speed limit of 25 miles per hour. (Id. at 1487-88). Petitioner became argumentative and "tried to explain how it happened like that." (Id. at 1487). While Officer Norman was sitting in his patrol car filling out an accident report, Charney knocked on the window and requested Officer Norman's assistance. (Id. at 1490). Based on his conversation with Charney, Officer Norman approached Petitioner to speak with him about returning Charney's cell phone to her. (Id. at 1491). Petitioner told Officer Norman that Charney's cell phone was in a ditch on the opposite side of the road where it "fell" in the water. (Id. at 1491). Officer Norman then asked Petitioner, "[W]hy don't you do the right thing and get it out of the water for her[?]" (Id.). Petitioner refused to get Charney's cell phone. (Id.).

Subsequently, Officer Norman noticed that Charney was cold while she was standing alone in front of his patrol car, so he asked her if she would like to sit in his patrol car where it was warm. (Id.). While Charney was seated in his patrol car, Officer Norman finished his report and issued Petitioner a citation for driving too fast for conditions. (Id. at 1492-93). When Officer Norman served Petitioner with the citation, Petitioner again became argumentative. (Id. at 1493).

When asked at trial by the prosecutor where Petitioner and Charney were when he left the scene, Officer Norman responded, "I got out of the car and gave him the citation and had to allow her to get out of the vehicle." (Id. at 1493-94). After leaving the scene, Officer Norman drove to his team office about three and a half miles away, completed his paperwork, and printed his report regarding Petitioner's accident. (Id. at 1494-97). Shortly after retrieving his report from the printer, Officer Norman heard an emergency call transmitted over his law enforcement radio for officers to respond to Petitioner's mother's house, which Officer Norman recognized as the same address that was listed on the accident report he had just printed. (Id. at 1497). The emergency call from the residence was made at 1:18 PM. (Id. at 1429-30). Officer Norman then added himself as a responding officer to the call and went to the residence. (Id. at 1498).

When Officer Norman arrived at the residence, he found four officers who had entered the residence before him, a small group of civilians who were not members of law enforcement or emergency services, and Petitioner lying face down on the floor of the living room in front of a sofa with his head in his arms flailing around as if he were running. (Id. at 1498-99). Officer Norman recognized Petitioner's face when Petitioner raised his head to tell a female, later identified as Petitioner's mother, "I buried the gun under a tree behind the house and leave me

4

alone." (Id. at 1499-1500). Petitioner made this statement when another officer was reviewing a consent to search form with his mother and not in response to any questions by law enforcement. (Id. at 1515-18). Later that day, Officer Norman noticed two homicide detectives in a wooded area behind the residence. (Id. at 1501). When Officer Norman walked to the wooded area himself, he found a shotgun that was later identified as the murder weapon under a dead pine tree that was lying on the ground. (Id. at 1501). The stock of the shotgun had been sawed off and the remaining handle was wrapped in electrical tape. (Id. at 1665-66).

Responding officers and emergency services personnel testified that there were massive amounts of blood and what appeared to be brain matter on the walls, on the ceiling, on the floor, and on several items in the upstairs bedroom of Petitioner's mother's house where Charney's body was found. (Id. at 1440-42; 1470). The State's forensic pathologist determined that Charney had sustained the type of injury associated with a shotgun wound that caused extensive destruction to the top of her head. (Id. at 1774). After reconstructing Charney's skull, the pathologist concluded that the entrance wound was in the center of Charney's forehead, above the bridge of her nose, above her eyebrows, and below her hairline. (Id. at 1778-79).

Detective Gary McFadden ("Det. McFadden") of the Charlotte-Mecklenburg Police Department arrived at Petitioner's mother's residence at 2:00 PM in response to a pager alert. (Id. at 1672-73). After obtaining information from other officers and speaking with Petitioner's mother, Det. McFadden attempted to talk with Petitioner, who was on the floor shaking as he had been since officers first arrived. (Id. at 1674-76). Det. McFadden first called Petitioner's name from a standing position, then knelt down beside Petitioner, touched Petitioner, and called Petitioner's name again. (Id. at 1676-77). Petitioner did not respond to Det. McFadden's efforts

to communicate with him. (<u>Id.</u> at 1677). After talking again with Petitioner's mother and his supervisor, at 2:45 PM Det. McFadden called for a paramedic to assess Petitioner's condition. (<u>Id.</u>). Det. McFadden then checked Petitioner's pockets to see whether there was "anything in his pocket that he could have taken to put him in that state, or anything in his pockets and [sic] that would have injured us or him at that time." (<u>Id.</u> at 1678). Det. McFadden removed Petitioner's identification, some keys, some chapstick, and a Bic lighter from Petitioner's pockets and placed them on a table in Petitioner's mother's residence. (<u>Id.</u>).

At 2:58 PM, paramedic crew chief George Ross arrived. (<u>Id.</u> at 1535-36). Ross initially checked Petitioner's vital signs, found they were normal, and noted that Petitioner did not have any apparent illness or injury. (<u>Id.</u> at 1536). Ross then conducted a more thorough examination of Petitioner, including a head-to-toe survey for any kind of injury, placing Petitioner on a monitor, checking blood sugar, checking blood pressure, checking heart rate, checking respiratory rate, and checking for neurological response. (<u>Id.</u> at 1537). Checking for neurological response included a sternum rub, involuntary eye reflex, and self-preservation reflex. (<u>Id.</u> at 1537-39). Petitioner responded to the painful sensation of knuckles being rubbed against his sternum by grabbing Ross's hands and pushing them away to stop the sternum rub. (<u>Id.</u> at 1537-38). Petitioner responded to the stimulus of Ross's finger being placed uncomfortably close to his eye by the involuntary twitching or fluttering of his eyelid. (<u>Id.</u> at 1538). Petitioner responded to his own arm being lifted over his face and dropped by Ross by moving his arm as it fell so it would not come into contact with his face or head. (<u>Id.</u> at 1538-39). After completing his assessment, Ross concluded that Petitioner was aware of his surroundings and could respond to verbal communication even though he was not responding to

verbal communication.  (Id. at 1539).  Ross then told a uniformed officer that Petitioner was conscious, aware of his surroundings, and could get an "Academy Award" for his acting performance.  (Id. at 1539-40).

Meanwhile, Det. McFadden had gone outside of the residence to talk to members of Charney's family who had recently arrived.  (Id. at 1678-79).  As Det. McFadden re-entered the residence, Petitioner arose off the floor, reached inside of his pants, pulled out his penis, and began to point it at everyone as if he wanted to urinate on every person in the room.  (Id. at 1679).  In response, Det. McFadden told other officers to direct Petitioner to the bathroom.  (Id.). After Petitioner was directed to the bathroom by officers, he returned to the living room area on his own.  (Id.).  At that time, Det. McFadden, seeing that Petitioner was alert, asked Petitioner if he would accompany officers to the Law Enforcement Center because the other members of Petitioner's family who were at the residence when officers arrived were also going to the Law Enforcement Center.  (Id.).  Petitioner agreed to accompany officers to the Law Enforcement Center.  (Id. at 1680).

2. Officers Escort Petitioner to the Law Enforcement Center, Petitioner is Placed in an Interview Room, and Leg Shackles are Applied

When Petitioner agreed to accompany officers to the Law Enforcement Center, Det. McFadden told other officers to direct Petitioner to a marked police vehicle which was near the driveway.  (Id.).  Two officers escorted Petitioner to the marked police vehicle.  At trial, officers testified that they escorted Petitioner to the vehicle because it had been raining and snowing, and because the hill from the police vehicle to Petitioner's mother's residence was slippery.  (Id. at 130; 181).  Petitioner was frisked, secured in the back seat of the police vehicle, and driven to the

Law Enforcement Center with two officers in the vehicle with him and no members of Petitioner's family present. (Id. at 195; 204; 210; 1529-31; 1680). Petitioner thereafter had no contact with any family members until after he was interrogated for the next several hours at the Law Enforcement Center.

At 3:45 PM, Detective McFadden and Petitioner left Petitioner's mother's house in different vehicles. (Id. at 1680). Det. McFadden arrived at the Law Enforcement Center at 3:56 PM, and Petitioner arrived at 3:57 PM. (Id.). Petitioner was escorted through the entrance that was used for prisoners and detainees. (Id. at 192-93). Department policy required that arrestees be taken to interrogation rooms and shackled to the floor. (Id. at 197). Petitioner was initially taken to a room without leg shackles. Moments later, however, the officers who had escorted Petitioner into the Law Enforcement Center advised detectives of the lack of shackles in the room, and were told to move Petitioner to another room that had shackles. (Id. at 206). The officers escorted Petitioner to an interview room and shackled him to the floor with leg shackles. The officers then slid an interview table in front of Petitioner, obscuring Petitioner's legs and shackles from the view of anyone entering the interview room. (Pet.'s Ex. L, 4:04: Video of Interrogations).[2] Petitioner was left shackled to the floor at 4:03 PM with an officer standing at the door, and Petitioner remained undisturbed in the interview room until Det. McFadden entered at 4:37 PM.

3. Detective McFadden Comes to the Interview Room to Interview Petitioner

When he arrived at the Law Enforcement Center, Det. McFadden first met with investigators assigned to investigate Charney's homicide, and at 4:37 PM he went to interview

_____

[2] Petitioner's Exhibit L is a disc containing recorded video from 4:02 PM until 9:35 PM on March 1, 2009, of the interview room where Petitioner met with Det. McFadden.

8

Petitioner. (Trial Tr. at 1680-82). When Det. McFadden entered the interview room, Petitioner was sitting at the interview table with his head down, resting on his arms, which were crossed on the interview table. (Pet.'s Ex. L, 4:38). When Det. McFadden attempted to get Petitioner's attention and asked Petitioner to sit up, Petitioner was unresponsive until he began shaking his head in the negative while it was lying on his arms, which remained crossed on the interview table. (Pet.'s Ex. L, 4:39-4:40). By the time Det. McFadden came into the room, Petitioner had been shackled to the floor for thirty-five minutes. McFadden asked Petitioner to consent to gunshot residue testing at 4:40. Det. McFadden left the room at 4:41 and returned at 4:46 with Detective Keith Martin ("Det. Martin") and a consent form for gunshot residue testing. (Pet.'s Ex. L, 4:46). The videotaped interrogation shows that while Petitioner was shackled to the floor, Det. McFadden repeatedly told Petitioner that he had to talk to him:

> "We need to do a couple of things, but we need to talk to you." (4:40:00)
> "Gary, you have to respond to me." (4:40:07)
> "You have to open your mouth, Gary." (4:40:12)
> "Gary, You've got to talk to me. You can't go out. You can't sit here all day." (4:40:40)
> "You have to talk to me." (4:40:47)
> "You have to talk to me. You have to respond to me." (4:40:59)
> "You got to talk to me, Gary." (4:41:08)
> "Look at me. Look at me. You have to talk with me." (4:41:24)
> "You have to talk to me, Gary." (4:41:30)
> "How 'bout if I give you a paper and then you'll talk to me." (4:41:36)
> "You've got to talk to me. Can't just shrug your shoulders and go on and on." (4:41:42)
> "You've got to talk to me." (4:41:58)
> "Gary, you've got to talk to me." (4:42:07)
> "Give me a yes or no. Yes or no, Gary?" (4:42:11)
> "We have to do a couple things. I have to talk to you. You have to talk to me, Gary." (4:47:31)
> "You have to talk to me." (4:48:08)
> "You can't bob your head out on the stand. What do you mean?" (4:49:30)
> "Gary, we got to get through this. No matter how much you want it to go away, it's not. We're here. You're prolonging it. We got to get through it. We got to get through it." (4:49:40)
> "I have to have a word, Gary." (4:50:15)

"Gary, we got to get through this. You don't want to sit here all day and I don't want to sit here all day." (4:50:48).

Det. Martin then told Petitioner that there were family members, including babies, down at the station who were waiting on him and would eventually run out of diapers and formula:

> Your family is down here and they're waiting on you. And the longer you drag it out the longer they're gonna have to wait on you. They got the babies. And they got diapers and formula and stuff but sooner or later that stuff's gonna run out. And they want to get back home and I'm sure you do, too, so let's get through this. They're waiting on you …The longer we sit and take for this, the longer you make them sit in the waiting room with babies. So do you want to drag this out for them?

(Pet.'s Ex. L, 4:50-51).

Petitioner held out his hands and nodded consent to the gunshot residue testing. (Trial Tr. at 1683; Pet.'s Ex. L, 4:54). At 4:54 p.m., two uniformed technicians entered the interrogation room to swab Petitioner's hands for gunshot residue and to photograph him. One technician asked Petitioner to stand for photographs. Petitioner pointed to his feet. Det. McFadden stood to move over toward Petitioner and Det. Martin looked underneath the table. At that point, Det. Martin became aware that Petitioner was shackled to the floor. Det. Martin looked at McFadden and said, "Garry." Det. Martin motioned his head in the direction of Petitioner's shackled feet. Det. Martin and Det. McFadden exchanged glances and Det. McFadden sat back down and scratched his head. A technician photographed Petitioner from many different angles and took pictures of his feet shackled to the floor. (Pet.'s Ex. L, 4:54-4:55).

Moments later, at 4:58 p.m., with another officer present, and while two uniformed technicians were in the process of swabbing Petitioner's hands for gunshot residue and photographing him repeatedly, Det. McFadden removed the leg shackles. Petitioner was not

given any explanation for why he had been shackled and Det. McFadden did not indicate to

Petitioner at that time that it was a mistake for Petitioner to be shackled. (Pet.'s Ex. L, 4:58).

Det. McFadden then told Petitioner repeatedly that Petitioner needed to talk to the detectives:

>"We're here to talk to you first." (5:05:55)
>"We are here to listen, however long it takes." (5:06:06)
>"Gary, you have to respond to me a little bit, okay." (5:06:10)
>"Gary, Look at me. Look at me. Work with me." (5:06:20)
>"That door is open, but we still need to know what's going on. You understand that? Look at me, Gary." (5:06:25)
>"Now, we didn't force you down here, did we?" (No response from Petitioner) "We want to talk to you." (5:06:36)
>"You got to talk to me, You got to talk to me." (5:06:53)
>"Gary, You got to talk to me, I know you can talk to me. You want us to know what happened, right? You don't want us to prejudge you or come up with some idea of what went on out there." (5:07:07)
>"Talk to me, Gary." (5:07:26)
>"Gary, you got to talk to me." (5:07:48)
>"You don't want to talk to me? Huh? You don't want to talk to me?" (5:07:58)
>"Gary you got to talk to us. You have to talk to us. You want to talk to us. Or you just want us to take it for what it is?" (5:08:36)
>"What happened today?" (5:10:33)

Det. McFadden asked Petitioner several more questions, and Petitioner wrote responses

on a pad of paper. Det. McFadden, joined by Det. Martin, repeatedly told Petitioner that he had

to talk to them:

>McFadden: Gary, Gary, Gary, Gary. I know. You got to explain it. You got to talk to me. (5:19:21)
>Martin: You can't bottle it up man. You gotta let it out. You gotta verbalize it. Gonna make things easier on you cause if anything there's gonna be a misunderstanding on there. (5:19:30)
>McFadden: Gary, Gary, Gary. (5:19:50)
>McFadden: You have to talk to me Gary. You can talk. You can talk. Can't you? You can't talk? You don't remember what happened? All fingers point to Gary and Gary can't talk. He can't tell me anything. I want you to talk to me. I want you to tell me. I want you to tell me. I can't understand what you're writing here. (5:20:31)
>McFadden: We're here to help you, but you gotta help yourself. (5:21:28)
>McFadden: It can't go away. It won't go away, Gary, no matter how much you, you want it to. This is very serious. And we're here to talk to you. And that's all we're asking. Can

you work with us here? Can you talk to me? (5:21:45)
McFadden: What happened after the wreck? You talked to the officers. And the officers talked to us out there today. He told us about that. Why can't you talk to us? (5:22)
Martin: Tell us about the wreck. How did that happen? Whose car was it?
Petitioner: My mom's. (5:22:36)

Petitioner finally started to give verbal responses at 5:22 p.m. before any explanation as to why he was shackled. Finally, at 5:40 p.m., forty-five minutes after the leg shackles were removed, and forty minutes after the interrogation started and Petitioner began talking, McFadden told Petitioner that the shackles had been a mistake. (Pet.'s Ex. L, 5:40). Petitioner was interrogated until 6:40 p.m. (Trial Tr. at 1685).

5. The First Interview

Petitioner's first interview, measured from the time Det. McFadden started asking questions and prompting Petitioner to talk, lasted from around 5:00 PM until 6:40 PM. At the beginning of the first interview, Det. McFadden asked Petitioner if he wanted some water. (Pet.'s Ex. L, 5:04). Det. McFadden also gave Petitioner McFadden's first name as well as the first name of Det. Martin. (Pet.'s Ex. L, 5:05). Det. McFadden told Petitioner that he and Det. Martin were not there to bully or mistreat Petitioner, but they needed to know what happened at the house and that the officers were there to listen. (Pet.'s Ex. L, 5:05-5:06). Additionally, Det. McFadden told Petitioner that he was not under arrest, repeated that Petitioner was not under arrest, and told Petitioner "that's the door . . . the door is open" and pointed to the open door of the interview room. (Pet.'s Ex. L, 5:06). Det. McFadden's first question about Charney's homicide was, "How long have you and this young lady been dating?" (Id.). Petitioner responded by counting on his fingers without ever arriving at a final number and by silently moving his lips. (Trial Tr. at 1686-87; Pet.'s Ex. L, 5:07-5:08). Petitioner then reached out, took

12

Det. McFadden's legal pad and pen, and began writing with his right hand. (Pet.'s Ex. L, 5:08-5:09). When Det. Martin asked Petitioner if he needed any water, Petitioner shook his head while he continued to write. (Pet.'s Ex. L, 5:09). Petitioner then proceeded to write short answers to Det. McFadden's questions, sliding the pad back and forth to Det. McFadden, and pausing to think about his answers and scratch his head. (Trial Tr. at 1687; Pet.'s Ex. L, 5:09-5:20). When written answers became too tedious, Petitioner finally began talking to the officers. (Id.; Pet.'s Ex. L, 5:22). Once he started talking, Petitioner explained the circumstances surrounding the accident he had earlier that day when he drove the black BMW. (Pet.'s Ex. L, 5:22-5:40). Petitioner was talking, gesturing, and communicating effectively in response to questions from Det. McFadden and Det. Martin on the subject of his automobile accident. (Pet.'s Ex. L, 5:22-5:40).

However, when the conversation turned to the subject of what happened at his mother's house, Petitioner's communication skills began to recede. (Pet.'s Ex. L, 5:28-5:40). At that point, Det. McFadden reiterated to Petitioner that he was not under arrest, that he was free to leave, that the door was open, and that Petitioner could walk out of the door. (Pet.'s Ex. L, 5:40-5:41). Also, Det. McFadden told Petitioner that his being placed in leg shackles was a mistake and that he was free to go. (Pet.'s Ex. L, 5:40-5:42). Instead of leaving, Petitioner remained in the interview room and gave a statement about his role in Charney's death. (Pet.'s Ex. L, 5:42-6:40). When Det. McFadden announced that they would take a break so the investigators could talk to Petitioner's relatives, Petitioner kept Det. McFadden and Det. Martin in the room to talk about his religion, how often he prays, the automobile accident, and how much Charney meant to him. (Pet.'s Ex. L, 6:39-6:44). When Det. McFadden again announced that the investigators

needed to take a break, Petitioner kept talking until Det. McFadden and Det. Martin left the

interview room at 6:48 PM.  (Pet.'s Ex. L, 6:44-6:48).  Petitioner requested to go to the restroom

and went to the restroom during this break.  (Pet.'s Ex. L, 6:55-6:58).

    6.  The Second Interview

When Det. McFadden and Det. Martin returned to conduct a second interview with

Petitioner, Det. McFadden brought a hand-held digital recorder.  (Trial Tr. at 1694-95; Pet.'s Ex.

L, 7:05-7:07).  Petitioner's second interview lasted from 7:05 PM until 7:55 PM.  Before

conducting the second interview, Det. McFadden confirmed that Petitioner understood that he

was not under arrest and that he was free to go.  (Pet.'s Ex. L, 7:07-7:09).  Det. McFadden also

told Petitoner that the second interview would be recorded.  (Pet.'s Ex. L, 7:10).  Before

beginning the interview, Det. McFadden told Petitioner, "You can say whatever you want; you

can talk for two hours if you want."  (Pet.'s Ex. L, 7:09).  Petitioner told Det. McFadden that he

was cold, and Det. McFadden procured a jacket and gave it to Petitioner to wear during the

interview.  (Pet.'s Ex. L, 7:15).

After starting the digital recorder, Det. McFadden again told Petitioner that he was not

under arrest, that he was free to leave, and that the door was open.  (Pet.'s Ex. L, 7:19).

Although Det. McFadden began the second interview by asking questions about the statement

that Petitioner had given in the first interview, Det. McFadden soon switched to asking open-

ended questions.  (Pet.'s Ex. L, 7:20-7:55).  Petitioner told substantially the same story about his

role in Charney's death and even stood up from his seat and began acting out portions of his

rendition of what happened.  (Trial Tr. at 1696-97; Pet.'s Ex. L, 7:20-7:55).  Before concluding

the interview, Det. McFadden asked Petitioner if there was anything else that Petitioner thought

the officers should know, if he had told officers everything that he wanted to say, and if there was anything that Petitioner wanted officers to look into as they conducted their investigation. (Pet.'s Ex. L, 7:47-7:48).

After the second interview, Petitioner's mother entered the interview room and spoke alone with Petitioner while the door was shut at Petitioner's request. (Pet.'s Ex. L, 7:58-8:17). When Petitioner and his mother were finished talking, they knocked on the door to ask for Det. McFadden to re-enter the room. (Pet.'s Ex. L, 8:14-8:18). When Det. McFadden re-entered the room, Petitioner's mother asked Det. McFadden "where we're standing at right now." (Pet.'s Ex. L, 8:14-8:18). In response, Det. McFadden informed Petitioner and his mother that the case had to be reviewed by a magistrate or judge and that other officers were currently presenting the information gathered during the investigation to a magistrate or judge. (Pet.'s Ex. L, 8:18). Petitioner's mother then asked Det. McFadden about having Petitioner evaluated because Petitioner had stated that he needed "help." (Pet's Ex. L, 8:18). Det. McFadden acknowledged that Petitioner had stated that he needed "help" during the course of the first two interviews, and Det. McFadden indicated that Petitioner would be evaluated and would get "help" because he asked for it. (Pet.'s Ex. L, 8:18-8:20). Petitioner's mother and Det. McFadden then left the interview room to talk about Petitioner getting an evaluation because Det. McFadden indicated that he did not feel comfortable talking about Petitioner's mental state in front of Petitioner. (Trial Tr. at 1697-98; Pet.'s Ex. L, 8:18-8:20).

7. The Third Interview—Petitioner is Read his Miranda Rights and Waives Them

Petitioner's third interview lasted from 8:24 PM until 8:54 PM. When Det. McFadden returned to conduct the third interview, Petitioner was seated in the interview room with his head

leaning against the wall and his eyes shut.  (Pet.'s Ex. L, 8:24).  After taking the time to get

Petitioner's attention and waiting for Petitioner to sit up at the interview table, Det. McFadden

told Petitioner, "We're going to have to arrest you for this, okay?"  (Doc. No. 1-21 at 2: Pet.'s

Ex. K, Third Interrogation Tr.; Pet.'s Ex. L, 8:24).  Upon receiving no response, Det. McFadden

repeated that he was placing Petitioner under arrest.  (Doc. No. 1-21 at 2; Pet.'s Ex. L, 8:25).

While Det. McFadden was reading Petitioner his Miranda rights from a printed waiver of rights

form, Petitioner was alternating between being unresponsive, changing the subject, and

interrupting Det. McFadden.  (Pet.'s Ex. L, 8:26-8:33).  At one point, Petitioner tucked his head

into the T-shirt he was wearing, put his head down in his arms on the interview table, and gave

muffled responses to Det. McFadden from there.  (Pet.'s Ex. L, 8:30-31).  Det. McFadden

repeatedly told Petitioner that he was trying to read Petitioner his rights, that Petitioner needed to

listen to Det. McFadden, and that Det. McFadden needed to get through the reading of

Petitioner's rights before he could engage in more conversation with Petitioner.  (Doc. No. 1-21

at 3-9; Pet.'s Ex. L, 8:24-8:34).  After reading Petitioner's Miranda rights to him and reviewing

the waiver of rights form with Petitioner, Det. McFadden placed the waiver of rights form in

front of Petitioner.  (Pet.'s Ex. L, 8:33).  Petitioner looked at the form for a while, thought it

over, picked up the pen, and signed the form.  (Pet.'s Ex. L, 8:33-8:34).  During the third

interview, Det. McFadden asked several open-ended questions and did not read any portions of

the previous statements given by Petitioner.  (Doc. No. 1-21 at 10-26; Pet.'s Ex. L, 8:34-8:50).

Petitioner told substantially the same story about his role in Charney's death as he had in

his first and second interviews.  (Doc. No. 1-21 at 10-26).  Petitioner told Det. McFadden that

when he and Charney returned to his mother's house after walking back from the scene where

Petitioner wrecked the black BMW, Charney rolled Petitioner a "blunt" or marijuana cigarette. (<u>Id.</u> at 10-12). Petitioner told Charney that bad things happened to him when they were together, and Charney told Petitioner to quit blaming her for his problems. (<u>Id.</u> at 10; 14). Petitioner then went outside to smoke the blunt that Charney had rolled for him. (<u>Id.</u> at 15). Petitioner smoked part of the blunt and "everything went white." (<u>Id.</u>). When Petitioner returned to the upstairs bedroom, he had retrieved a shotgun that he had found a few days earlier and placed outside a vacant house next door. (Trial Tr. at 1692-93). When Charney saw Petitioner with the shotgun, she told Petitioner that she was not scared of him and that, if Petitioner was going to kill her, he should go ahead and do it. (Doc. No. 1-21 at 19-21). Petitioner believed that his encounter with Charney was "deja vu" and he had seen it before. (<u>Id.</u> at 21). Petitioner also heard the voice of God telling him that everything happens for a reason and that Petitioner was "just going to have to do it." (<u>Id.</u> at 18-19). After hearing a loud clap of thunder, Petitioner stood up, pointed the shotgun at Charney, and fired it as he was raising the shotgun above Charney's head. (<u>Id.</u> at 21-22). Petitioner then heard the sound of a car horn and saw that his mother and family had returned to the residence, so he went downstairs and told his mother that Charney was dead. (<u>Id.</u> at 22-24).

After the third interview, Petitioner's mother and her boyfriend came into the interview room and spoke alone with Petitioner. (Trial Tr. at 1699; Pet.'s Ex. L, 9:21-9:35). During their conversation, Petitioner told his mother that there was a camera in the corner of the interview room, indicated the camera's location with his eyes, and told her that he had noticed the camera when he first arrived in the room before any interviews began. (Pet.'s Ex. L, 9:26).

## II. STANDARD OF REVIEW

A. Summary Judgment Standard

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

B. Section 2254 Standard

In addition to the motion for summary judgment standard set forth above, this Court must also consider the Petition for Writ of Habeas Corpus under the requirements set forth in 28 U.S.C. § 2254. Section 2254(d) provides that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Tice v. Johnson, 647 F.3d 87, 103 (4th Cir. 2011).

A claim is considered "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." Young v. Catoe, 205 F.3d 750, 755 (4th Cir. 2000) (quoting Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999)). A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "It is not enough for us to say that, confronted with the same facts, we would have applied the law differently; we can accord [the petitioner] a remedy only by concluding that the state court's application of the law in his case was objectively unreasonable." See Tice, 647 F.3d at 103 (citing Williams v. Ozmint, 494 F .3d 478, 483-84 (4th Cir. 2007)). "[W]e will not discern an unreasonable application of federal law unless 'the state court's decision lies well outside the boundaries of permissible differences of opinion.'" Id. at 108 (quoting Goodman v. Bertrand, 467 F.3d 1022, 1028 (7th Cir. 2006)).

## III.    DISCUSSION

### A.    Petitioner's Ground One

In his first ground for relief, Petitioner contends that his right to due process was violated by the trial court's failure to suppress his statements that were made in custody and the police failed to advise him of his rights at the outset of interrogation. Before trial, the trial court conducted an extensive hearing on a number of interrelated motions, including Petitioner's motion to suppress his statements made to law enforcement officers. (Trial Tr. at 63-530).

Based on the evidence presented, the trial court concluded as follows:

> That the defendant was not in custody at the time he conversed with the officers at his residence or during the first two interviews and conversations with law enforcement officers at the Law Enforcement Center. That the defendant was, in fact, in custody during the third interview and conversation with law enforcement at the Law Enforcement Center which commenced at 8:25 P.M. on March 1, 2009. That prior to making his statement Detective McFadden read the defendant his constitutional rights under <u>Miranda v. Arizona</u> and the defendant was in full understanding of his constitutional right to remain silent and his constitutional right to counsel, and all other rights. That the defendant freely, knowingly, intelligently, and voluntarily waived each of those rights and thereupon made the statement to Detective McFadden.
>
> That none of the defendant's constitutional rights of the Fourth, Fifth, Sixth, or Fourteenth Amendment to the United States Constitution were violated by the State, nor were any of the defendant's constitutional rights under the Constitution of North Carolina violated by the State during any of the four interviews and conversations with law enforcement and the defendant, including the statement made by the defendant at his residence and the three statements made by the defendant at the Law Enforcement Center.
>
> That the defendant's silence during the first statement he had with law enforcement at his residence, and his silence at the outset of the first conversation he had with law enforcement at the Law Enforcement Center, occurred during the time when he was not in custody, and he had not been expressly advised of his right to remain silent, and the State was not required to afford him that right at that juncture. That as such his silence was not an assertion or an exercise of a knowing constitutional right. That such silence is lawfully admissible as evidence of the defendant's state of mind during relevant periods following the alleged murder.

(Doc. No. 1-3 at 22-23).

The trial court based the order on the evidence presented at the suppression hearing, including a video recording containing the three interviews of Petitioner at the Law Enforcement Center.[3]  (<u>Id.</u> at 20).  Here, the trial court determined that Petitioner was not in custody when he spoke to the officers at the residence or during the first two interviews and conversations with

---

[3]  The trial court noted that it "had difficulty during the entire four hour viewing of the three videotaped interviews with the defendant understanding much of the defendant's statements, by reason of his diction, mumbling, and lack of enunciation."  (<u>Id.</u>).

law enforcement officers at the Law Enforcement Center, and therefore Miranda warnings were not required until his formal arrest.  Because the North Carolina Court of Appeals did not specifically address the custody issue in its opinion, and instead assumed arguendo that Petitioner was in custody during all three interviews, the last reasoned state court adjudication of the custody question is the trial court's order denying the suppression motion and holding that Petitioner's constitutional rights were not violated by the admission of his statements.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991) ("look through" doctrine requires federal court to look through summary orders to last reasoned opinion addressing issue); Jones v. Sussex I State Prison, 591 F.3d 707, 717 (4th Cir. 2010) (noting that "[s]ome of our sister circuits have found trial-court adjudication sufficient to trigger the deferential review set forth in AEDPA").

The Court begins by determining the relevant, clearly established Supreme Court law.  First, the Supreme Court held in Miranda v. Arizona that pre-interrogation warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings."  384 U.S. 436, 458 (1966).  The Court explained that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id. at 444.  The Supreme Court subsequently identified the test for determining whether a suspect is in custody and, therefore, must receive Miranda warnings before questioning, as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

21

Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted). Relevant factors for determining whether a suspect is "in custody" for Miranda purposes include the location of the questioning, the duration, statements made during the interview, and the presence or absence of physical restraints during questioning. See Howes v. Fields, 132 S. Ct. 1181, 1189 (2012). See also Yarborough v. Alvarado, 541 U.S. 652, 662-63 (2004); Stansbury v. Calif., 511 U.S. 318, 323 (1994); Berkemer v. McCarty, 468 U.S. 420, 442 & n.35 (1984). Courts must "examine all of the circumstances surrounding the interrogation," Stansbury, 511 U.S. at 322, including any circumstance that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave," id. at 325. On the other hand, the "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. Id. at 323. The test, in other words, involves no consideration of the "actual mindset" of the particular suspect subjected to police questioning. Alvarado, 541 U.S. at 667; see also California v. Beheler, 463 U.S. 1121, 1125 n.3 (1983) (per curiam); J. D. B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011).

This Court first finds that the trial court's findings as to the statements made by Petitioner while still at his mother's residence was neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor was the trial court's order based on an unreasonable determination of facts in light of the evidence presented in the state court proceedings. First, regardless of whether Petitioner was in custody while still at his mother's residence, Petitioner's statement to his mother, "I buried the gun under a tree behind the house and leave me alone[,]" was simply not the product of custodial interrogation. Interrogation includes questioning or other conduct that is reasonably likely to elicit an incriminating response from the subject.

Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Thus, when a suspect makes a statement spontaneously, or volunteers a statement not in response to interrogation, Miranda warnings are not required. Id. Here, Petitioner made the above statement to his mother at a time when an officer was reviewing a consent to search form with Petitioner's mother and not in response to any questions by law enforcement. (Trial Tr. at 1499-1500; 1515-18). At the suppression hearing, Officer Norman testified that he was present when Petitioner made the above statement to his mother and that he (Norman) had not said anything to Petitioner when Petitioner made the statement. (Id. at 85-87). Also at the suppression hearing, Officer Pleasant Roper testified that he was asking Petitioner's mother for consent to search her residence when Petitioner lifted his head and torso off the floor and made the above statement to his mother. (Id. at 124-26). Officer Roper did not talk to Petitioner when Roper was attempting to get consent to search the residence from Petitioner's mother, and Officer Roper was not talking about Petitioner to Petitioner's mother when he was attempting to get consent to search her residence. (Id. at 124-26). Additionally, none of the officers who were present when Petitioner made the above statement were directing inquiries to Petitioner at the time he made the statement. (Id. at 126).

The above statement was the only inculpatory statement that Petitioner made at his mother's residence. Although several officers and family members had asked Petitioner if he was alright and if he could get up off the floor, none of the officers at the residence asked Petitioner any questions regarding Charney or how Charney was killed. (Id. at 102-03; 111-12; 115-16; 120; 278-79). When officers asked Petitioner to get up, Petitioner ignored them and remained on the floor. (Id.). Other officers at the residence had no interaction with Petitioner at all. (Id. at 214-17; 224; 236; 240; 247-48; 381). In fact, Petitioner's only other verbal statement

at the residence was "watch out for your boots" when Officer John Gary inadvertently stepped near where Petitioner was lying on the floor while Officer Gary's attention was focused on the conversation that he was having with Officer Roper.  (Id. at 72-73).  Therefore, as to Petitioner's statement at his mother's residence that "I buried the gun under a tree behind the house and leave me alone," the trial court's order denying Petitioner's suppression motion was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

Next, as to the trial court's determination that Petitioner was not in custody when he gave his statements during the first and second interviews at the Law Enforcement Center, and that he was, therefore, not entitled to Miranda warnings, this Court finds that the trial court unreasonably applied clearly established Supreme Court law in so finding.   Given the specific circumstances of this case, a reasonable person in Petitioner's position would not have felt that he was free to leave the interview room during the first and second interviews.  Here, after police found Charney's body, Petitioner, eighteen years old at the time, became the immediate and prime suspect of a brutal and gruesome murder.  After volunteering where the murder weapon was hidden, Petitioner was then escorted by two police officers from his mother's residence to a marked police car, where he was frisked, placed in the police car, and then taken to the Law Enforcement Center.  When arriving at the Law Enforcement Center, officers took Petitioner to an interview room, where he was placed in leg shackles, and kept in them for the next hour. Petitioner was then interrogated for the next several hours, and he had no contact with family members during this time, until he met with his mother several hours into the interrogations.  As the Court has already noted, Det. McFadden did not tell Petitioner that the shackles had been a mistake until about 45 minutes after they were removed and after Petitioner had already begun

answering the detectives' questions. While shackled, Petitioner's freedom of movement was most certainly restricted to the degree associated with a formal arrest. <u>United States v. Salim</u>, No. 10-CR-0042, 2011 WL 337142, at *5 (D.C.V.I. Feb. 3, 2011) (observing that the petitioner's "freedom of movement was clearly restricted and an objectively reasonable person in Defendant's shoes (or shackles) would not have felt free" to leave). Although Respondent argues in its brief that neither Det. McFadden nor Det. Martin knew that Petitioner was shackled when they entered the interview room, this fact is wholly irrelevant, as the subjective belief of Detectives McFadden and Martin as to whether Petitioner was in custody is simply irrelevant to the "in custody" analysis. <u>Stansbury</u>, 511 U.S. at 323.

The Court recognizes that it is undisputed that when Det. McFadden and Det. Martin discovered that Petitioner was shackled, the shackles were removed, and Det. McFadden repeatedly told Petitioner during the first and second interviews that he was free to leave, that the door was open, and that he could walk out the door at any time. (<u>Id.</u> at 298). However, these later statements by Det. McFadden did not cure the fact of the initial shackling and the effect it would have had on a reasonable person's beliefs regarding whether he was free to leave even after he was unshackled, particularly given that Det. McFadden did not tell Petitioner that the use of shackles had been a mistake until 5:40 PM, a full, forty-five minutes after the leg shackles had been removed, and forty minutes after the interrogation had begun and after Petitioner had begun to talk to the detectives.[4]

Despite this Court's finding that the trial court's decision regarding the custody issue was

---

[4] Indeed, the lynchpin for this Court and the most salient facts tending towards a finding that Petitioner was in custody are the facts that Petitioner was initially shackled when he was brought into the interview room, and just after being escorted by police officers in a marked police car from the scene of Charney's murder, where he was the obvious prime suspect.

an unreasonable application of clearly established Supreme Court law, Petitioner is not entitled to relief on habeas review because any error by the state trial court in admitting the statements from Petitioner's first and second interviews simply did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 622 (1993). Here, as the Court discusses in more detail below, the evidence of Petitioner's guilt of first-degree murder was overwhelming, even in the absence of the statements he gave before he was given and waived his Miranda rights. For all these reasons, Petitioner's first ground for relief is without merit.

In sum, Petitioner's first ground for relief is without merit.

B.      Petitioner's Ground Two

In Petitioner's second ground for relief, Petitioner contends that the Miranda warnings delivered during his third interview were ineffective to the point that a person in his position would not have understood them to mean that he had a choice about continuing to talk. To support this contention, Petitioner asserts he was subjected to two, complete in-custody, pre-Miranda interrogations, and made two in-custody pre-Miranda inculpatory statements, before he was arrested and read his Miranda warnings. Petitioner claims no reasonable person in his position would have believed at that point that he had any real choice about whether to give a statement, so his Miranda warnings were ineffective under Missouri v. Seibert, 542 U.S. 600 (2004). Petitioner raised the substance of his second ground for relief on direct appeal, and the North Carolina Court of Appeals adjudicated and denied it on the merits as follows:

> Finally, Defendant alleges that his motion to suppress was improperly denied because he was in custody at the time he was removed from his home, was not advised of his rights at the outset of interrogation, and he unequivocally invoked his right to counsel. We disagree.

It is axiomatic that "Miranda warnings protect a defendant from coercive custodial interrogation by informing the defendant of his or her rights." State v. al-Bayyinah, 359 N.C. 741, 749, 616 S.E.2d 500, 507 (2005). Thus, it is error for a trial court to admit into evidence a statement made by a defendant, while in custody, where that defendant has not been given the warnings required by Miranda. See, e.g., State v. Greene, 332 N.C. 565, 578, 422 S.E.2d 730, 737 (1992). The parties disagree as to whether Defendant was in custody when he participated in his first two interviews with detectives. It is uncontroverted that during those two interviews, Defendant had not been read his Miranda rights.

Even assuming, arguendo, that the statements Defendant made during his first two interviews with the detectives were admitted in error that does not mean that there was prejudicial error so as to require a new trial. See State v. Siler, 292 N.C. 543, 552, 234 S.E.2d 733, 739 (1977). Where a defendant's prior inadmissible statement is "in all material respects identical to his admissible second statement," it can be said that "the error was harmless beyond a reasonable doubt." Id. (citing Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705 (1967)). Here, Defendant gave a full confession in his third interview with police-which occurred after he had been read his Miranda rights and waived them.

State v. Daniels, 2012 WL 698180, at *3.

The Court finds that the state court's adjudication of Petitioner's second ground for relief was neither contrary to nor an unreasonable application of Supreme Court law.[5] First, Petitioner's reliance on Seibert is misplaced. In Seibert, the Supreme Court addressed the admissibility of statements obtained by a two-step questioning process, whereby the police (1) intentionally withheld Miranda warnings from a suspect who had been formally arrested and questioned her until she confessed, and then (2) obtained a Miranda rights waiver from the suspect and covered the same material using leading questions. 542 U.S. at 605-06 (plurality opinion). A plurality of four justices held that the statements elicited after the Miranda warnings were inadmissible. Id. at 617. Specifically, the plurality opined that the admissibility of the warned statements depended "on whether Miranda warnings delivered midstream could be

---

[5]  This Court agrees with Respondent that the North Carolina Court of Appeals did not, as Petitioner suggests, overlook Petitioner's Miranda and Seibert claims on his direct appeal.

effective enough to accomplish their object," considering the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the first two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. Id. at 615. Justice Kennedy concurred in the judgment, but opined that the plurality's multi-factor test "cuts too broadly," as it applies to cases involving both intentional and unintentional two-stage interrogations. Id. at 621 (Kennedy, J., concurring in the judgment). Justice Kennedy concluded that Oregon v. Elstad, 470 U.S. 298 (1985), should continue to govern the admissibility of post-warning statements unless a two-step questioning strategy was deliberately used. Id. at 622.

Because Seibert is a plurality opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." United States v. Mashburn, 406 F.3d 303, 308 (4th Cir.2005) (quoting Marks v. United States, 430 U.S. 188, 193 (1977)). As Justice Kennedy's concurring opinion sets forth the narrowest grounds for the Court's holding, his opinion represents the holding in Seibert. Mashburn, 406 F.3d at 309. Thus, "[t]he admissibility of postwarning statements is governed by Elstad unless the deliberate 'question-first' strategy is employed." Id. (footnote omitted).

Here, there is no evidence that the detectives deliberately employed an intentional, two-stage scheme of in-custody interviews to subvert the effectiveness of the Miranda warnings. Indeed, as the Court has already discussed, it is undisputed that Det. McFadden and Det. Martin did not know when they walked in the interrogation room and began asking Petitioner questions

that Petitioner was shackled.[6]  Furthermore, once they realized that Petitioner was shackled, they promptly removed the shackles, and then made clear to Petitioner before and during the interviews that he was free to leave.  Specifically, before beginning any interrogation, Det. McFadden told Petitioner that he was not under arrest, repeated that Petitioner was not under arrest, and showed Petitioner the open door to the interview room.  (Pet.'s Ex. L., 5:06).  Thus, the circumstances of this case do not support a finding that the detectives were deliberately withholding a Miranda warning.  Indeed, the circumstances support the fact that the detectives took intentional steps to ensure that the first two interviews were not custodial interrogations subject to Miranda as well as their subjective belief that Petitioner was not in custody during his first two interviews.

Under these circumstances, the Court agrees with Respondent that Seibert does not govern the analysis; rather, Elstad controls.  In Elstad, the defendant made an initial inculpatory statement to police while in his home after he was placed under arrest.  Elstad, 470 U.S. at 300-01.  He was not read his Miranda rights, however, until he was taken to the police station, where he waived his rights and made a second inculpatory statement.  Id.  The defendant argued that the second statement should be suppressed because it was related to the first unwarned statement made in his home, and was induced or caused by the first statement.

The Supreme Court held, however, that although a Miranda violation rendered the first statement inadmissible, the second statement was properly introduced because "neither the

_____

[6]  Unlike the test for determining the "in custody" issue, the subjective knowledge and intent of Detectives McFadden and Martin is relevant in determining whether the officers deliberately attempted to subvert Miranda by use of an intentional, two-stage scheme of "in custody" interviews.  Accord United States v. Moore, 670 F.3d 222, 230 n.3 (2d Cir. 2012) (stating that in determining deliberateness under Seibert, "[s]ubjective evidence of the investigators' intent, if credible, will of course be persuasive, and often decisive").

general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression given the facts of that case." Id. at 308. The Court further held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" to any later post-warning statement. Id. at 314. Rather, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." Id. at 318.

As in Elstad, neither the goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppressing Petitioner's third statement under the facts of this case. These two goals would not be served because the circumstances of this case do not support a finding that Det. McFadden employed a deliberate, two-step interrogation strategy to intentionally subvert the Miranda warnings he gave Petitioner before conducting the third interview. During the third interview, Det. McFadden asked several open-ended questions, listened to Petitioner's answers, and did not read any portions of the previous statements given by Petitioner. (Doc. No. 1-21 at 10-26; Pet.'s Ex. L, 8:34-8:50). Det. McFadden also explored facts that were not included in Petitioner's first two statements, such as asking Petitioner if Charney tried to attack him before Petitioner shot her. (Doc. No. 1-21 at 24-25). Furthermore, Det. McFadden did not ask questions about inculpatory facts that Petitioner divulged during his first two interviews, such as the fact that Petitioner had found the shotgun a few days before shooting Charney and placed it outside a vacant house next door where he could retrieve it and the fact that, when Petitioner's mother and family arrived at the residence immediately after Petitioner shot Charney, Petitioner hid the shotgun behind the sofa in the living room of his mother's house before moving it to the dead pine tree behind his mother's

house.[7]  See (Doc. No. 1-21 at 1-30; Trial Tr. at 1693-94).  This third interview of Petitioner

stands in contrast to the interrogation technique used in Seibert to "question first, then give the

warnings, and then repeat the question 'until I get the answer that [defendant] already provided

once.'"  Seibert, 542 U.S. at 605-06.  Petitioner's second ground for relief is therefore without

merit and will be dismissed.

In sum, the North Carolina Court of Appeals' adjudication of Petitioner's claim was

neither contrary to nor an unreasonable application of, clearly established federal law, as

determined by the Supreme Court, i.e., Elstad or the minimum holding necessary to adjudicate

Seibert.  Nor is the above-quoted state court adjudication based on an unreasonable

determination of facts, in light of the evidence presented in the state court proceedings.

In sum, Petitioner's second ground for relief is without merit.

C.       Petitioner's Ground Three

In his third ground for relief, Petitioner asserts that he clearly and unequivocally asserted

his right to counsel, which was patently ignored by the interrogating officer in violation of his

right to counsel during custodial interrogation.  Under clearly established Supreme Court law, in

order to effectively invoke the right to counsel, a suspect must make an "unambiguous request,"

and must "articulate his desire to have counsel present sufficiently clearly that a reasonable

---

[7]   The fact that Det. McFadden did not prompt or ask Petitioner in the third interview to repeat
critical, inculpatory statements he made in the first and second interviews, such as the
circumstances surrounding his possession of the shotgun, indicates that Det. McFadden was not
engaging deliberately in a two-step interrogation process to subvert Miranda.  Rather, this
indicates that Det. McFadden viewed the first two interviews as non-custodial so that Miranda
warnings were not required, and that he was assuming that all of the statements made during
these apparent non-custodial conversations would be fully admissible in court.  These
circumstances suggest that Det. McFadden, therefore, saw no need in the third interview for
Petitioner to repeat everything he had already stated in the first and second interviews.

police officer in the circumstances would understand the statement to be a request for an attorney." <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994). Here, the North Carolina Court of Appeals ruled that Petitioner's request for counsel could not be clearly understood and was not unambiguous:

> The only remaining issue is whether the trial court erred in finding that Defendant did not unequivocally invoke his right to counsel. "If a criminal suspect invokes his right to counsel at any time during custodial interrogation, the interrogation must cease, and it cannot be resumed in the absence of an attorney unless the defendant initiates further discussion with the officers." <u>State v. Hyatt</u>, 355 N.C. 642, 655, 566 S.E.2d 61, 70 (2002) (citation omitted). In order to invoke the right to counsel, a defendant "'must unambiguously request counsel.'" <u>Id.</u> (quoting <u>Davis v. United States</u>, 512 U.S. 452, 459, 129 L.Ed.2d 362, 371 (1994)). When evaluating whether such an unambiguous request was made, we must determine "whether the defendant articulated his desire for counsel sufficiently that a reasonable officer in the circumstances would have understood the statement to be a request for an attorney." <u>State v. Jackson</u>, 348 N.C. 52, 56, 497 S.E.2d 409, 411 (1998).
>
> While he was read his Miranda rights, Defendant had the following exchange with Detective Gary L. McFadden:
>
> Detective McFadden: I have the right to talk to a lawyer and to have a lawyer here with me now to advise me during questioning. You understand that?
>
> Defendant: Yes. Which I would like.
>
> Detective McFadden testified that he did not hear or understand Defendant when he said: "Yes. Which I would like." The trial court found, after watching the videos of Defendant's interrogations, that Defendant was difficult to understand throughout, and that "had the Court not been following along during the playing of the videotape with the written transcript of the interview the Court would not have understood from the audio portion of the videotape the defendant stating 'Yes. Which I would like.'"
>
> "It is axiomatic that, as a threshold issue to assessing whether a reasonable officer under the circumstances would have understood a statement made by a suspect to be a request for an attorney, the statement must at least be perceived by the accompanying officer." <u>Hyatt</u>, 355 N.C. at 656, 566 S.E.2d at 71. Because the evidence supports the trial court's finding that Detective McFadden did not hear Defendant's statement, we affirm that finding. Thus, we need not assess whether Defendant's statement could reasonably be construed as an assertion of the right to counsel. <u>See id.</u>

<u>State v. Daniels</u>, No. COA11-1032 (N.C. App. Mar. 6, 2012) (unpublished).

In its order denying Petitioner's motion to suppress, the trial court also noted

> [t]hat the only audio recording of this statement is contained in the videotape that was made, which is required now by current state law. That the court had difficulty during the entire four hour viewing of the three videotaped interviews with the [Petitioner] understanding much of the [Petitioner's] statement, by reason of his diction, mumbling, and lack of enunciation. That had the court not been following along during the playing of the videotape with the written transcript of the interview the court would not have understood from the audio portion of the videotape the defendant stating "'Yes. Which I would like.'"

(Doc. No. 1-3 at 20). The trial court found

> that the Petitioner's statement 'Yes. Which I would like' and the statement 'yeah. What do I have to do' are not unequivocal requests or assertions for the presence or assistance of a lawyer, particularly when viewed with the compared to statements by other defendants making unequivocal requests for counsel as set forth in many of the leading cases in this area including <u>McNeil v. Wisconsin</u>, 501 U.S. 171 (1991); <u>Minnick v. Mississippi</u>, 498 U.S. 146 (1990); <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981); <u>Oregon v. Bradshaw</u>, 462 U.S. 1039 (1983); and <u>United States v. Davis</u>, 512 U.S. 452 (1994)."

(<u>Id.</u>).

Based on the above findings, the trial court and the North Carolina Court of Appeals properly concluded that Petitioner did not clearly and unambiguously invoke his right to counsel, as required by <u>Davis v. United States</u>. The Court finds that these state court adjudications were neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor were they based on an unreasonable determination of the facts in light of the evidence presented to those courts. Respondent further contends, and the Court agrees, that the videotaped interrogation itself, as well as the transcript, attached as Petitioner's Exhibit K attached to his § 2254 petition, undermine Petitioner's assertion that Petitioner clearly and unequivocally asserted his right to counsel. Petitioner's Exhibit K is a certified verbatim transcript produced from the video recording of Petitioner's third interview with Det. McFadden that was "prepared at the

defendant's attorney's request by a certified court reporter."[8] (Doc. No. 1-3 at 18: Pet.'s Ex. B; Doc. No. 1-21 at 30). This court reporter transcribed the crucial question from Det. McFadden beginning on line twenty-five, page seven of Petitioner's Exhibit K, as follows: "I have the right to talk to a lawyer and to have a lawyer here with me now to advise me during questioning. You understand that?" (Id. at 7-8). The same court reporter transcribed Petitioner's response to this question as follows: "Yes. Can you turn on the light?" (Id. at 8). If an independent, disinterested court reporter who was producing a certified verbatim transcript of the video recording of Petitioner's third interview transcribed Petitioner's crucial response as "Yes. Can you turn on the light?," rather than "Yes. Which I would like[,]" then Petitioner's alleged assertion of his right to counsel was not clearly understood and was not unambiguous. A reasonable officer in Det. McFadden's position who had taken the time to get Petitioner's attention and wait for Petitioner to sit up at the interview table, then been faced with Petitioner alternating between being unresponsive, changing the subject, and interrupting while Det. McFadden read Petitioner his Miranda rights, would not have understood Petitioner's mumbled response to Det. McFadden's inquiry as being an unambiguous assertion of his right to counsel. (Id. at 2-9; Pet.'s Ex. L, 8:24-8:34). Petitioner's own behavior and his own tactics created the condition where a reasonable officer like Det. McFadden could not clearly understand Petitioner's alleged assertion of his right to counsel.

When Det. McFadden saw Petitioner carefully considering the waiver of rights form

---

[8]  The court reporter that transcribed Petitioner's Exhibit K further certified that "I am neither counsel for, related to nor employed by any of the parties to the action in which this proceeding was heard; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto and I am not financially or otherwise interested in the outcome of the action." (Doc. No. 1-21 at 30).

before picking up the pen and signing the form, Det. McFadden came to the logical conclusion that Petitioner was waiving his right to counsel and wanted to make a statement. (Pet.'s Ex. L, 8:33-8:34). In sum, the state court's adjudication of Petitioner's third claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor was the state court decision based on an unreasonable determination of facts, in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to habeas relief on this ground.

In sum, Petitioner's third ground for relief is without merit.

D. Whether Error by the State Court Had a "Substantial and Injurious" Impact on the Verdict

Finally, this Court finds that, as to all of Petitioner's grounds for relief, any possible error was harmless for purposes of federal habeas review. Regardless of what police detectives may or may not have thought about the need to obtain more details about the shooting from Petitioner himself, given the obvious, overwhelming evidence of Petitioner's guilt and the brief interval between Petitioner's actions at the accident scene and Charney's murder, any possible error committed by the trial court in failing to suppress any of Petitioner's inculpatory statements made during police questioning did not have a "substantial and injurious" impact on the verdict. No reasonable jury would have returned any other verdict than guilty of first-degree murder under the circumstances of this case, even without Petitioner's inculpatory statements during police questioning. Any potential error was therefore harmless for purposes of federal habeas review. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (harmless error standard on federal habeas review requires trial error to have "substantial and injurious effect or influence in

determining the jury's verdict" to warrant relief) and <u>Fry v. Pliler</u>, 551 U.S. 112 (2007) (<u>Brecht</u>'s

"substantial and injurious effect" standard applies on federal habeas review whether or not the

state appellate court found error or applied the "harmless beyond a reasonable doubt" standard of

<u>Chapman</u>).

In his brief, Petitioner contends that the fact that the jury was deliberating the case from

March 31, 2011, to April 6, 2011, meant that the jury was struggling over whether to convict

Petitioner, and that the jury "strongly considered returning a verdict of second-degree murder."

(Doc. No 13-1 at 25). Petitioner contends that the State repeatedly relied on Petitioner's

statements to argue the elements of first-degree murder—specifically, intent to kill,

premeditation, and acting with deliberation. According to Petitioner, in the absence of the

alleged error, the jury would have returned a different verdict, possibly second-degree murder.

This Court does not agree. Here, Respondent has calculated in its reply brief that the actual jury

deliberation time was 18 hours and 34 minutes, which is not an inordinate time for jury

deliberations in a case such as this, in which the jury was faced with the arduous task of deciding

whether to send an eighteen-year-old to prison for the rest of his life. (Doc. No. 17 at 20).

Moreover, as Respondent further notes, the jury never indicated to the trial court that it could not

reach a verdict or that it was struggling to reach a verdict. The jury asked only for re-instruction

on all of the elements of first-degree murder and second-degree murder one time.[9] (Trial Tr. at

1946-47). Furthermore, once the trial court instructed the jury on the lone element of

deliberation and provided a written copy of the jury instruction on that element, the jury took

---

[9] The trial court then re-instructed the jury that first-degree murder "is the unlawful killing of a human being with malice and with premeditation and deliberation" and that second-degree murder "is the unlawful killing of a human being with malice, but without premeditation and deliberation." (Trial Tr. at 1949-50).

only one hour to return a verdict of guilty.10  (Id. at 1973-80).  Nothing in the record indicates that any possible error in admitting Petitioner's inculpatory statements made during police questioning had a substantial and injurious effect or influence in determining the jury's verdict. In sum, if any possible error occurred in this case, it was harmless under Brecht and Petitioner is therefore not entitled to a writ of habeas corpus.

IV.    CONCLUSION

For the reasons stated herein, Respondent is entitled to summary judgment as to all of Petitioner's claims.  To this extent, Petitioner's own summary judgment motion will be denied.

**IT IS, THEREFORE, ORDERED** that:

1.    Respondent's Motion for Summary Judgment, (Doc. No. 7), is **GRANTED**, Petitioner's Motion for Summary Judgment, (Doc. No. 13), is **DENIED**, and the petition is dismissed.

2.    Respondent's Motion for Leave to File Excess Pages, (Doc. No. 8), is **GRANTED** nunc pro tunc.

3.    It is further ordered that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional

---

10   The trial court re-instructed the jury that deliberation means "the defendant acted while the defendant was in a cool state of mind.  This does not mean that there had to be a total absence of passion or emotion.  If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect."  (Trial Tr. at 1979-80).

claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: September 24, 2014

Frank D. Whitney
Chief United States District Judge